UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/31/08

——————————————————————x

IN RE TOP TANKERS, INC.
SECURITIES LITIGATION

06 Civ. 13761 (CM)

——————————————————————x

## MEMORANDUM DECISION AND ORDER APPROVING
## SETTLEMENT AND AWARDING FEES

McMahon, J.:

Before the court are unopposed motions to approve the settlement of this class action

lawsuit and to award attorneys' fees to class counsel.

The court has already written an extensive opinion in this matter, denying the motion to

dismiss. Familiarity with that opinion is presumed and the court will not discuss the facts of the

matter, except in passing.

### A. *The Settlement*

Under the terms of the proposed settlement, defendants Top Tankers Inc. ("TOPT" or the

"Company," which is now known as Top Ships Inc.), Evangelos Pistiolis ("Pistiolis") and

Stamatis Tsantanis ("Tsantanis") (collectively, the "Defendants") have paid the sum of one million

two hundred thousand dollars ($1,200,000) in cash (the "Settlement Amount") into an interest-

bearing escrow account on behalf of Lead Plaintiff and the Class.[1] The proposed Settlement

---

[1] Defendants' payment is in exchange for the dismissal of all claims brought against Defendants in
this Action (the "Settlement"). *See* ¶3 of the Declaration of Benjamin J. Sweet in Support of
Final Approval of Settlement, Plan of Allocation and Application for an Award of Attorneys' Fees
and Expenses and Reimbursement Award to Lead Plaintiff (the "Declaration" or "Decl.")
submitted herewith on behalf of Lead Counsel, the law firm of Schiffrin Barroway Topaz &
Kessler, LLP ("SBTK"). The terms of the proposed Settlement are set forth in the Stipulation
(continued...)

-1-

provides the Class with some recovery (though hardly the "substantial" recovery claimed by plaintiff's counsel) in light of the significant risks Lead Plaintiff faced moving forward with this Action – particularly overcoming Defendants' defenses at summary judgment and/or trial, and the possibility that Lead Plaintiff would not be able to obtain a more favorable recovery, if any recovery at all. This Settlement also avoids the time and expense continued litigation would require -- through the completion of merits and expert discovery -- as well as the costs associated with litigating against a foreign corporate defendant and individual defendants located in the Marshall Islands and Greece.

## A.     *The Notice Process and the Reaction of the Class*

Pursuant to the Court's April 28, 2008 Preliminary Approval Order, the Notice of Proposed Settlement, Motion for Attorneys' Fees and Reimbursement of Expenses and Fairness Hearing (the "Notice") was mailed to 30,293 potential Class Members or their nominees commencing on or before May 13, 2008.[2] In addition, a summary notice was published in *Investor's Business Daily* and over the PR Newswire on May 20, 2008. SCS Aff. ¶6.

The Notice contained a detailed description of the nature and procedural history of the Action, as well as the material terms of the Settlement, including without limitation: (i) Lead

---

(...continued)

and Agreement of Settlement dated April 23, 2008 (the "Stipulation"), which was previously filed with the Court. All capitalized terms not defined herein shall have the same meanings as set forth in the Stipulation.

[2] *See* the Affidavit of Paul Muholland, CPA, CVA, Concerning Mailing of Notice of Proposed Settlement, Motion for Attorneys' Fees and Reimbursement of Expenses and Fairness Hearing and Proof of Claim and Release, submitted herewith on behalf of Strategic Claims Services ("SCS"), the Claims Administrator in this Action (the "SCS Aff."), at ¶¶4, 8. The SCS Affidavit is attached as Exhibit 1 to the Declaration, and a copy of the Notice is attached as Exhibit C to the SCS Affidavit.

Plaintiff's estimate of the per share recovery; (ii) the manner in which the Settlement Amount plus interest, less any taxes, administration costs, award of attorneys' fees and expenses to Lead Counsel and reimbursement to Lead Plaintiff (the "Net Settlement Fund") will be allocated among participating Class Members; (iii) a description of the claims that will be released in the Settlement; (iv) the right and mechanism for Class Members to exclude themselves from the Class; and (v) the right and mechanism for Class Members to object to the Settlement. *See* Exh. 1(C) to the Declaration.

Not a single objection to the Settlement has been received, and only three Class Members have requested to be excluded from the Class. SCS Aff. ¶10.

## II. History and Background of the Action

### *A. Procedural History*

A complete and accurate description of the procedural history of the case can be found in the Court's December 18, 2007 decision denying defendants' motion to dismiss.

### *B. Investigation and Discovery*

Prior to reaching the Settlement, Lead Counsel conducted an investigation into the claims of the Class. Prior to commencing the action, Lead Counsel's investigation included, among other things: (i) review and analysis of public filings by TOPT with the SEC; (ii) review and analysis of press releases, public statements, news articles and other publications disseminated by TOPT and the Individual Defendants; (iii) review and analysis of TOPT's analyst conference calls; (iv) review and analysis of securities analysts' reports concerning TOPT; (v) review and analysis of other publicly available information concerning TOPT and the Individual Defendants; (vi) consultation with a damages consultant and a language consultant; and (vii) research of the

-3-

applicable law with respect to the claims asserted in the Action and Defendants' potential defenses thereto. Decl. ¶17.

The Parties also engaged in modest discovery prior to reaching the Settlement. Pursuant to the Court's December 18, 2007 ruling on Defendants' motion to dismiss, Defendants produced and Lead Plaintiff reviewed and analyzed approximately 400 pages of documents regarding TOPT's accounting treatment for the seller's credit, TOPT's restatement and E&Y's resignation as TOPT's auditor. Lead Plaintiff also noticed and were preparing to depose Defendants Pistiolis and Tsantanis, as well as a member of TOPT's Board of Directors, when the tentative Settlement was reached. Additionally, Lead Counsel was in the process of negotiating with E&Y for the production of additional documents, as well as the deposition of one of E&Y's accountants. Decl. ¶18. The court, of course, had ordered that depositions be completed within thirty days of its order, so the negotiations could not have been extensive.

In addition, Defendants also served Lead Plaintiff with a request for documents on October 1, 2007 and, shortly thereafter, noticed Lead Plaintiff's deposition. On November 9, 2007, Lead Plaintiff responded to Defendants' discovery requests, producing documents related to his transactions in TOPT common stock. Lead Plaintiff sat for a deposition on November 27, 2007. Decl. ¶19.

### C.    Settlement Negotiations

The Parties began discussing a possible resolution of the Action following the Court's ruling on Defendants' motion to dismiss. The Parties participated in several weeks of arm's-length telephonic negotiations before reaching a tentative agreement to settle the Action. Thereafter, the Parties spent additional months negotiating the terms of the Settlement. The

-4-

Parties finalized the papers supporting the Settlement and executed the Stipulation on April 23, 2008. The Court granted preliminary approval of the Settlement on April 28, 2008. Decl. ¶16.

## III. The Settlement Meets the Judicial Standards for Final Approval Under Rule 23(e)

### A. *The Standard of Review for Approval of Class Action Settlements*

Courts observe a general policy favoring the settlement of disputed claims, especially with respect to class actions. *In re Ashanti Goldfields Sec. Litig.*, No. CV-00-717 (DGT), 2005 U.S. Dist. LEXIS 28431, at \*3-4 (E.D.N.Y. Nov. 15, 2005). *See also Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("The settlement of complex class action litigations are clearly favored by the courts."). Moreover, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); *see also Weinberger*, 698 F.2d at 73 ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation.").

While the decision to grant or deny approval of a settlement lies within the broad discretion of the trial court, courts have recognized that a settlement represents an exercise of judgment by the negotiating parties and that, while a court should not give "rubber stamp approval" to a proposed settlement, it must "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974). As stated by the court in *Newman v. Stein*:

> [T]he role of a court in passing upon the propriety of the settlement of a derivative or other class action is a delicate one. . . we recognized that since "'the very purpose of a compromise is to avoid the trial of sharply disputed issues and to

-5-

dispense with wasteful litigation,' the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial.'

464 F.2d 689, 691-92 (2d Cir. 1972) (citation omitted). Rather, a strong initial presumption of fairness attaches to a proposed settlement if "it was the product of arm's-length negotiations conducted by a capable counsel, well-experienced in class action litigation arising under the federal securities laws." *In re Veeco Instruments Secs. Litig.*, No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 85629, at \*17 (S.D.N.Y. Nov. 7, 2007) (internal citations omitted). *See also In re EVCI Career Colleges Holding Corp. Sec. Litig.*, Master File No. 05 Civ. 10240 (CM), 2007 U.S. Dist. LEXIS 57918, at \*12 (S.D.N.Y. July 27, 2007) ("Absent fraud or collusion, the Court should be hesitant to substitute its judgment for that of the parties who negotiated the settlement."). Here, where Lead Counsel engaged in settlement negotiations with Defendants over several weeks, followed by additional months negotiating the details of the Stipulation and related settlement documents, this presumption of fairness should readily attach.

## B. *The Settlement is Fair, Reasonable, and Adequate and in the Best Interests of the Class*

The standard for reviewing the proposed settlement of a class action in the Second Circuit, as in other circuits, is whether the proposed settlement is "fair, reasonable and adequate." *Luxottica Group*, 233 F.R.D. at 310; *In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689(SAS), 2003 U.S. Dist. LEXIS 17090, at \*9 (S.D.N.Y. Sept. 29, 2003). Further, "in any case there is a range of reasonableness with respect to a settlement." *Newman*, 464 F.2d at 693. The Settlement proposed in this Action clearly falls within the "range of reasonableness."

The Second Circuit has identified nine factors that courts should consider in deciding whether to approve a proposed settlement of a class action:

-6-

(1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463. All nine factors need not be satisfied; rather, a court should look at "the totality of these factors in light of the particular circumstances." *In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*, No. 02 MDL 1484 (JFK), 2007 U.S. Dist. LEXIS 93423, at *26 (S.D.N.Y. Dec. 19, 2007) (internal citations omitted).

### 1. The Risks of Litigation

In assessing the Settlement, the Court should balance the benefits afforded the Class, including the *immediacy* and *certainty* of a recovery, against the continuing risks of litigation. *See Grinnell*, 495 F.2d at 463. In this Action, while the Court sustained Lead Plaintiff's claims against Defendants at the pleading stage, the ability of Lead Plaintiff to survive a motion for summary judgment was doubtful. It turned on the information that would have been yielded by the limited discovery ordered by the Court in its December 18, 2007 Order.[3] That discovery was never completed. Obviously, Lead Plaintiff believed they faced substantial risks, particularly with respect to proving Defendants' liability, if the Action were to proceed. Decl. ¶23. The case was – to put it mildly – thin. The settlement amount reflects this. The court recognizes the settlement for what it is -- a nuisance settlement in a *de minimis* amount – and certifies that this is exactly the

_____

[3] According to the Court's Order, "the appropriate date for the start of the class period and the value of this lawsuit to plaintiffs and to counsel – may well be impacted by how the facts play out concerning [the point in time at which the accounting dispute between E&Y and Defendants arose]." *See* Court's December 18, 2007 Order, at p. 11, n. 8.

sort of case that ought to be settled in such a manner.

### a. The Risks of Establishing Liability

Courts routinely recognize that securities class actions present hurdles to proving liability that are difficult for plaintiffs to clear. *See In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, MDL Docket No. 1500, 2006 U.S. Dist. LEXIS 17588, at *39 (S.D.N.Y. Apr. 6, 2006) (noting that "the difficulty of establishing liability is a common risk of securities litigation"); *Indep. Energy*, 2003 U.S. Dist. LEXIS 17090, at *11 (noting difficulty of proving scienter). *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). In their motions to dismiss, answer to the Amended Complaint and during the Parties' settlement negotiations, Defendants vigorously and consistently asserted that Lead Plaintiff would be unable to prove specific information giving rise to any inference of scienter on the part of Defendants. With respect to TOPT's accounting for the $55 million seller's credit associated with its 2006 Sale and Leaseback Transactions, Defendants asserted that they acted in good faith at all times and exercised reasonable due diligence in reliance on the approval of their outside auditor, E&Y. Defendants contended that, not only did E&Y review the Company's first two quarterly financial statements for 2006 and approve the Company's initial accounting treatment of the seller's credit, but E&Y also issued a comfort letter that included the quarter during which the transaction was booked. Defendants further contended that after E&Y re-reviewed the seller's credit and decided that it should be accounted for as a "residual value guarantee," TOPT restated its financial results for the effected quarters of 2006, demonstrating that TOPT was "completely forthright" in its

-8-

actions.[4] In further support of this assertion, Defendants point to the fact that the Company's restatement resulted in the reduction of net income by only $0.01 per share for Q1 2006 and only $0.07 per share for Q2 2006, as well as to the absence of any insider stock sales. Decl. ¶24.

In addition, Defendants also raised, among others, the following defenses to Lead Plaintiff's claims: (i) any alleged misrepresentations or omissions, if any, are immaterial as a matter of law; (ii) TOPT's public statements, registration statement/prospectus and SEC filings contained adequate warnings of the risks related to investments in TOPT securities; (iii) certain of the alleged false and misleading statements are non-actionable forward-looking statements and protected by the PSLRA's safe-harbor provision; and (iv) the decline in TOPT's earnings had nothing to do with the claims asserted by Lead Plaintiff, but rather was the result of "hindsight, bad timing or bad luck" in the face of a volatile tanker market (*i.e.*, "additional charter expenses and "heavy, extended dry-docketing schedule"). Going forward, Lead Plaintiff would expect Defendants to build foundations for each of these defenses, and others, and to assert many of them at summary judgment and/or trial. Decl. ¶25. It would have cost substantially more than the amount of the settlement to resolve these issues on the merits.

### b. The Risks of Establishing Damages

Lead Plaintiff also faced substantial obstacles to proving loss causation and damages. In order to prove loss causation and damages, Lead Plaintiff would be required to prove that Defendants' alleged false and misleading statements and omissions of material fact inflated the price of TOPT common stock during the Class Period, and that upon the Company's disclosure of such misinformation, the price of TOPT common stock dropped and damaged Lead Plaintiff and the Class.

---

[4] *See* Defendants' Memorandum in Support of Motion to Dismiss the Corrected and Amended Consolidated Class Action Complaint, at pp. 10-12.

Lead Plaintiff would also be required to prove the amount of artificial inflation in the price of TOPT common stock. Decl. ¶26. *See, e.g., Gordon Partners v. Blumenthal*, No. 02 Civ. 7377 (LAK) (AJP), 2007 U.S. Dist. LEXIS 9110, at *37 (S.D.N.Y. Feb. 9, 2007) (granting defendant's motion for summary judgment for, among other reasons, plaintiff's failure to demonstrate loss causation); *In re Omnicom Group, Inc. Secs. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (same).

Although Lead Plaintiff would have presented expert testimony if its case had not been dismissed summarily based on the narrow dispositive issue identified in the court's December 18, 2007 decision, one cannot predict how a jury would have responded to that testimony. This uncertainty is compounded by the fact that there would likely be testimony from multiple experts on such areas as the shipping industry, accounting and damages. Moreover, the crucial element of damages would likely be reduced at trial to a "battle of the experts." Decl. ¶26. *See, e.g., EVCI Career College*, 2007 U.S. Dist. LEXIS 7918, at *24 (citing *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd*, 117 F.3d (2d Cir. 1997) (noting unpredictability of outcome of battle of damage experts)); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) ("establishing damages at trial would lead to a 'battle of experts' . . . with no guarantee whom the jury would believe").[5] The Class was by no means assured of a ruling in its favor. Thus, the uncertainties concerning liability, loss causation and damages strongly support approval of the Settlement.

### 2. *The Reasonableness of the Settlement in Light of the Best Possible Recovery and*

---

[5] In addition, before a jury may determine whether Lead Plaintiff's or Defendants' damages model is more accurate, a court must first determine that Lead Plaintiff's damages model is admissible. *See, e.g., Carpe v. Aquila, Inc.*, No. 02-0388-CV-W-FJG, slip op. at 3-8 (W.D. Miss. Mar. 23, 2005) (granting defendants' motion to exclude plaintiffs' expert testimony); *Kaufman v. Motorola, Inc.*, No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627, at *7 (N.D. Ill. Sept. 21, 2000) (precluding in part plaintiffs' expert testimony).

### *the Attendant Risks of Litigation*

The adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984); *Luxottica Group*, 233 F.R.D. at 316 ("The present settlement, achieved after years of active litigation, must be balanced against the expense and delay necessary to achieve a potentially larger result after trial and appeals."). The Court need only determine whether the Settlement falls within a "'range of reasonableness.'" *PaineWebber*, 171 F.R.D. at 130 (citation omitted); *see also Indep. Energy*, 2003 U.S. Dist. LEXIS 17090, at *13 (noting few cases tried before a jury result in the full amount of damages claimed).

The range of reasonableness of the Settlement Amount in light of the best possible recovery and the attendant risks in litigation, was an important consideration in Lead Counsel's decision to settle the Action and weighs strongly in favor of the Settlement. Here, the Class will receive $1,200,000 in cash in exchange for the release of all claims against the Defendants. This recovery represents approximately 10.8% of the Class' estimated damages (according to a preliminary damage calculation by Lead Plaintiff's damages consultant as $13 million). *See Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *19 (S.D.N.Y. Oct. 24, 2005) (finding settlement representing 3.8 % of plaintiffs' estimated damages to be within the range of reasonableness); *Merrill Lynch*, 2007 U.S. Dist. LEXIS 9450, at *33 (S.D.N.Y. Jan. 31, 2007) (finding settlement representing recovery of approximately 6.25% of estimated damages to be "at the higher end of the range of reasonableness of recovery in class action securities litigations").[6]   In

---

[6]   Moreover, if it was determined through further discovery that the disagreement between
(continued...)

reaching the Settlement, Lead Counsel placed particular emphasis on: (i) the risk of continued prosecution of the Action; (ii) Defendants' significant defenses to scienter; and (iii) the time and expense which would be required to prosecute the Action through trial, especially in light of the location of the corporate defendant (the Marshall Islands), as well as its former auditor, E&Y (Greece). Decl. ¶27. In light of the foregoing, the Settlement provides a substantial recovery for the Class and falls well within the range of possible recovery considered fair, reasonable and adequate. Indeed, given the distinct possibility that the case would ultimately have been dismissed on the merits, the settlement is generous.

### 3. *The Complexity, Expense and Likely Duration of the Litigation*

"The expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement." *Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984). *See also In re: Gilat Satellite Networks, Ltd.*, CV-02-1510 (CPS), 2007 U.S. Dist. LEXIS 29062, at *36 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to litigate."); *Strougo v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) (it is "beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members") (internal quotations omitted). The cost of litigating this case would have been exorbitant – the translation costs alone would have approximated the settlement amount, and the overall cost of litigation was likely to exceed any reasonable estimate of the maximum possible recovery. Ongoing litigation would surely necessitate researching and complying with a foreign body of law and navigating through the complicated rules

(...continued)

Defendants and E&Y occurred after March 13, 2006, the total pool of damages available to the Class would be decreased substantially. *See* Court's December 18, 2007 Order, at p.12.

and procedures of international law, such as the Hague Convention. In the discovery phase of litigation alone, the cooperation of witnesses beyond the subpoena power of the Court, may well have proven elusive¶28. *See Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, No. 01-CV-11814(MP), 2004 U.S. Dist. LEXIS 8608, at \*7 (S.D.N.Y. May 14, 2004) (approving settlement in action against foreign company, where many of the defendants, witnesses and documents were located abroad, beyond the court's subpoena power); *Schwartz v. Novo Industri A/S*, 119 F.R.D. 359, 363 (S.D.N.Y. 1988) (weighing complications of discovery with a foreign defendant in favor of settlement). Again, the amount at issue – assuming the largest possible class size and agreeing with plaintiffs' damages expert on the damages model – would have dwarfed the amount of attorneys' fees needed to deal with these matters.

Expert discovery would also be both time-consuming and extremely expensive as the issues involved would require each side to obtain specialized experts in the shipping industry, in addition to accounting and damages experts. Moreover, the costs associated with litigating the Action, through the completion of merits and expert discovery, summary judgment, preparation for trial, and trial, would be significant. The class would likely never see a dime; any recovery would be eaten up by the cost of litigating. *See AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at \*33 ("Each step of the way, expenses would continue to accumulate, further decreasing the funds available to Class Members."); *Hicks*, 2005 U.S. Dist. LEXIS 24890, at \*16 ("Further litigation would necessarily involve further costs [and] justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action.").

## 4. *The Reaction of the Class to the Settlement*

The reaction of the Class to the Settlement is a significant factor in assessing its fairness and

adequacy, and "'the absence of objectants may itself be taken as evidencing the fairness of a settlement.'" *PaineWebber*, 171 F.R.D. at 126 (citation omitted); *see also Veeco*, 2007 U.S. Dist. LEXIS 85629, at *21-22 (where no objections and one request for exclusion were received, the Court found this fact to show those affected by the settlement had "overwhelmingly endorsed it" and noted that the reaction of the class is perhaps "the most significant factor to be weighed in considering its adequacy") (citing *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362-63 (S.D.N.Y. 2002). Indeed, following the dissemination of over 30,000 copies of the Notice to potential Class Members, and as of the July 2, 2008 deadline for filing objections and/or requests for exclusion, not one recipient of the Notice has objected to the Settlement, and only three Class Members have requested exclusion from the Class. *See* SCS Aff. ¶¶8, 10. This absence of dissent combined with the minimal number of exclusions militates strongly in favor of the Court's final approval of the Settlement. Decl. ¶30. Additionally, over 1,000 claim forms have been submitted by Class Members, well before the September 12, 2008 submission deadline, further evidencing the support of the Class. SCS Aff. ¶12.

## 5. *The Stage of the Proceedings and the Amount of Discovery Completed*

In evaluating a settlement, "There is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact. It is clear that the court need not possess evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation." Newberg & Conte, NEWBERG ON CLASS ACTIONS §11.45 (4th ed. 2002); *see also In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) (finding that it was not necessary for court to find that parties had engaged in extensive discovery in order to approve a proposed settlement; but rather that it need merely find that

-14-

they engaged in sufficient investigation to enable court to make intelligent appraisal of case) (internal citation omitted).

By the time the Settlement was reached, Lead Counsel had sufficient knowledge and understanding of the merits of the claims alleged in the Action and the defenses that would be asserted by Defendants to determine that the Settlement confers a benefit upon the Class. Lead Counsel obtained this knowledge by reviewing the documents produced by Defendants and by preparing to depose the accountants and a member of TOPT's Board, as well as by consulting with a damages expert. Lead Counsel's understanding of the strengths and weaknesses of Lead Plaintiff's claims was further enhanced following several weeks of hard-fought settlement negotiations with Defendants. Once this court handed down its decision denying the motion to dismiss and its truncated scheduling order, the matter had advanced to a stage where the parties certainly "'have a clear view of the strengths and weaknesses of their cases.'" *Teachers' Ret. Sys.*, 2004 U.S. Dist. LEXIS 8608, at *10 (citation omitted).

### *6.    The Risks of Maintaining the Class Action Through Trial*

Here, the Class as pled in this Action has only been certified for settlement purposes. But for the Settlement, and as evidence in Defendants' Answer to the Amended Complaint, Defendants would have attacked testimony provided by Lead Plaintiff at his deposition and contested Lead Plaintiff's motion for class certification. Even if certified, the Defendants would have likely taken any opportunity to argue for decertification as the Action progressed. Further, there is no assurance of maintaining certification of a class, as courts may exercise their discretion to re-evaluate the appropriateness of class certification at any time. Decl. ¶32. *See Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005); *Chatelain v. Prudential-Bache Sec.*, 805 F. Supp. 209, 214

-15-

(S.D.N.Y. 1992) ("Even if certified, the class would face the risk of decertification."). Thus, the Settlement avoids any uncertainty with respect to this decertification.

The Settlement also provides the largest possible class period. As the court found in its prior decision, there was a substantial likelihood that the class would end up being much smaller – perhaps infinitessimally small – depending on when the dispute between TOPT and its accountants arose.

### 7. *Ability of Defendants to Withstand a Greater Verdict*

In assessing a proposed settlement, the court may also consider the defendants' ability to withstand a judgment greater than that secured by settlement. *Grinnell*, 495 F.2d at 463. While it is not necessarily the situation here that Defendants could not withstand a greater judgment, the question exists whether Lead Plaintiff could ever *collect* on a judgment, since all Defendants are located abroad in the Marshall Islands and Greece. Decl. ¶33. Therefore, this Court should find that an analysis of this factor also weighs in favor of the Settlement.

## IV. *Certification of the Settlement Class is Proper*

In *Amchem Prods. v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997), the Supreme Court held that a class seeking to be certified for purposes of effectuating a settlement must satisfy the applicable requirements of Rules 23(a) and 23(b)(3), *i.e.*, numerosity, commonality, typicality, adequacy of representation, predominance of common issues, and superiority. *See In re Blech Secs. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999) ("Class action treatment [...] is particularly appropriate when plaintiffs seek redress for violations of the securities laws..[and]..[a]ccordingly, in [securities cases], when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward."). This Court conditionally certified the proposed Class in its Preliminary Approval Order and, as detailed below, the proposed Class satisfies

the requirements of Rules 23(a) and 23(b)(3).

## *A. Numerosity, Commonality, and Typicality*

The Class meets the numerosity, commonality, and typicality standards of Rule 23(a)(1)-(3). Over 30,000 copies of the Notice were sent to potential Class Members who purchased or otherwise acquired the common stock of TOPT between March 13, 2006 and November 29, 2006, inclusive. *See* SCS Aff ¶8. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 FRD 147, 157 (S.D.N.Y. 2007) ("Class certification is frequently appropriate in securities fraud cases involving a large number of shares traded publicly in an established market." (internal citation omitted); *Cross v. 21st Century Holding Co.*, No. 00 Civ. 4333 (MBM), 2004 U.S. Dist. LEXIS 2283, at \*4 (S.D.N.Y. Feb. 18, 2004) ("[c]ommon sense dictates" that class members in securities cases exceed 100). There are substantial questions of law and fact common to all Class Members (*e.g.*, whether Defendants alleged conduct violated the federal securities laws and whether Defendants' public statements misrepresented material facts about the Company's business, operations and management).

In *Amchem*, 521 U.S. at 625, the Supreme Court noted that the common issues test is readily met in securities cases. *See also Veeco*, 235 F.R.D. 220, 238 (S.D.N.Y. 2006) ("The commonality requirement has been applied permissively in the context of securities fraud litigation."); *In re MetLife Demutualization Litig.*, 229 F.R.D. 369, 373 (E.D.N.Y. 2005) (noting that securities fraud cases, by their very nature, usually allege a common course of conduct which meets the requirements of Rule 23(a)(2)). Further, Lead Plaintiff's claims are "typical" of other Class Members' claims because he purchased or acquired TOPT common stock during the period of asserted price inflation and thus has alleged economic harm similar to that suffered by other Class Members. Decl. ¶¶35-37. *See In re Host Am. Corp. Secs. Litig.*, Master File No. 05-CV-1250 (VLB), 2007 U.S. Dist. LEXIS 77418,

at *14-15 (D. Conn. Oct. 18, 2007) (finding typicality where plaintiffs alleged that defendants committed the same acts, in the same manner against all class members).

## B. Adequacy of Representation

The adequacy requirement of Rule 23(a)(4) requires Lead Plaintiff to demonstrate that: (1) there is no conflict of interest between Lead Plaintiff and the other Class Members; and (2) Lead Counsel is qualified, experienced and capable of conducting the Action. *AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at *20-21. Here, this Court has already designated the proposed class representative as Lead Plaintiff pursuant to the PSLRA, which provides that the Court "shall appoint as lead plaintiff the member or members of the plaintiff class that the court determines to be most capable of adequately representing the interest of class members." 15 U.S.C. §78u-4(a)(3)(B)(i). Lead Plaintiff retained competent counsel with extensive experience litigating complex securities class actions, which this Court has already approved. *See* biography of SBTK attached to the Declaration as Exhibit 2. Thus, Lead Plaintiff and his counsel have diligently advanced the interests of the Class. Decl. ¶38.

## C. Predominance of Common Issues and Superiority

Certification of a class under Rule 23(b)(3) requires that common issues predominate over individual issues and that the class action mechanism is superior to other methods of adjudicating the controversy. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132-33 (2d Cir. 2001). In this Action, both of these requirements are satisfied. First, in order to satisfy this requirement, it must be shown that the issues subject to generalized proof predominate over the issues subject to only individualized proof. *Id.* at 136. As the Supreme Court recognized in *Amchem*, "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust

-18-

laws." *Amchem*, 521 U.S. at 625. Here, the issues of liability and causation are common to all members of the Class and clearly predominate over any individual issues. Second, resolution of this Action through a class action is far superior to litigating thousands of individual claims where the expense for a single investor in pursuing a separate action would likely exceed the individual's loss in TOPT common stock. *In re Salomon Analyst Metromedia Litig.*, No. 02 Civ. 7966 (GEL), 2006 U.S. Dist. LEXIS 41939, at *29-30 (S.D.N.Y. June 20, 2006) ("[i]t is beyond dispute...that in determining whether defendants made false representations or omitted material facts, with scienter, and in connection with the purchase or sale of securities,...common issues will predominate over individual ones"). Decl. ¶39.

In light of the foregoing, all of the requirements of Rules 23(a) and 23(b)(3) are satisfied, and thus, the Court should certify this Class for settlement purposes.

## *V.    The Plan of Allocation is Fair, Reasonable and Adequate*

The Gross Settlement Fund will be used first to pay (i) any taxes owed; (ii) all administrative costs, including the costs of notice; and (iii) attorneys' fees, expenses and interest as awarded by the Court. Upon approval of the Settlement and entry of an order approving distribution, the Net Settlement Fund shall be distributed to Class Members who are not otherwise excluded from the Class and who timely submit valid Proof of Claim and Release forms ("Proofs of Claim") to the Claims Administrator ("Authorized Claimants"). Each Authorized Claimant shall be allocated a percentage of the Net Settlement Fund based upon the relationship that each authorized claim bears to the total of all authorized claims as explained in the proposed Plan of Allocation (the "Plan") contained in the Notice. The Plan sets forth the manner in which the Net Settlement Fund shall be distributed to Authorized Claimants. Decl. ¶40. *See also* SCS Aff. Exh. C.

-19-

The standard for approval of a plan of allocation is the same as the standard for approving a settlement: "namely, it must be fair and adequate." *Maley*, 186 F. Supp. 2d at 36 (citation omitted). Further, "If the plan of allocation is formulated by 'competent and experienced class counsel, an allocation plan need only have a 'reasonable, rational basis.'" *Taft v. Ackermans*, No. 02 Civ. 7951 (PKL), 2007 U.S. Dist. LEXIS 9144, at *27 (S.D.N.Y. Jan 31, 2007) (citing *Hicks*, 2005 U.S. Dist. LEXIS 24890, at *19-20). *See also Indep. Energy*, 2003 U.S. Dist. LEXIS 17090, at *15 (giving considerable weight to opinion of counsel in making its decision to approve plan of allocation). Lead Counsel, after careful consideration and detailed analysis, prepared the Plan with the assistance of its damage consultant. Decl. ¶40.

The Plan reflects the proposition that the price of TOPT common stock was artificially inflated from the beginning of the Class Period on March 13, 2006 through the end of the Class Period on November 29, 2006. The Plan takes into account, among other things, the impact of two separate disclosures made by TOPT: (i) on June 27, 2006, whereby the price of TOPT common stock dropped from an opening price of $7.45 on this date to a closing price of $6.40 on June 28, 2006 (resulting in a 13.69% one-day decline) and (ii) on November 29, 2007, whereby the price of TOPT common stock dropped from a closing price of $5.86 on November 28, 2007 to a closing price of $5.04 on November 29, 2007 (resulting in a decline of 14%). Decl. ¶41, n. 6. The Plan is not a formalized damage study however. It is a simplified methodology designed solely to compare one Class Member to another through their respective transactions in TOPT common stock during the Class Period.

The Plan was fully disclosed in the Notice that was sent to more than 30,000 potential Class Members beginning on or before May 13, 2008 and, as of the filing of this Declaration, there have

-20-

been no objections to the Plan. *See* SCS Aff. ¶¶8, 11. Differences in treatment of Class Members are made only with respect to the timing of Class Members' purchases, acquisitions and sales of TOPT common stock. Overall, if the total recognized losses for all Authorized Claimants exceeds the Net Settlement Fund, each Authorized Claimants' share of the Net Settlement Fund will be determined based upon the percentage that his, her or its recognized loss bears to the total recognized losses for all Authorized Claimants. Decl. ¶42. *See also Merrill Lynch*, 2007 U.S. Dist. LEXIS 9450, at *39 ("A plan of allocation that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is reasonable."). Thus, Lead Counsel believes that this method of allocation is fair, reasonable and adequate and that the Plan should be approved.

## IV.    Attorneys' Fees

In connection with final approval of the Settlement[7] in the above-captioned action (the "Action"), Court-appointed Lead Counsel, the law firm of Schiffrin Barroway Topaz & Kessler, LLP ("SBTK"), has moved for: (i) an award of attorneys' fees in the amount of twenty-five percent (25%) of the Settlement Amount and (ii) reimbursement of $26,777.33 in out-of-pocket expenses that Lead Counsel incurred in successfully prosecuting the claims in this Action, plus interest on both amounts. Lead Counsel also respectfully moves this Court for an award in the amount of $3,000 to Lead Plaintiff as reimbursement for activities undertaken on behalf of the Class.

As the court had expected, Lead Plaintiff and Defendants (the "Parties"), by and through their respective counsel, began discussing a possible resolution of the Action immediately following the

---

[7] This Memorandum incorporates by reference the definitions contained in the Stipulation and Agreement of Settlement dated April 23, 2008 (the "Stipulation"). In support of this Memorandum, Lead Counsel is also submitting the Declaration of Benjamin J. Sweet in Support of Final Approval of Settlement, Plan of Allocation and Application for an Award of Attorneys' Fees and Expenses and Reimbursement Award to Lead Plaintiff (the "Declaration" or "Decl.").

Court's ruling on Defendants' motion to dismiss. These discussions were conducted telephonically. Following several weeks of negotiations, the Parties reached a tentative agreement to settle the Action. Thereafter, the Parties spent additional months negotiating the terms of the Settlement and related documents, executing the Stipulation on April 23, 2008.

## A. Compensation from the Common Fund Recovered for a Class is Rooted in Both Equity and Public Policy

The Supreme Court, as well as courts in this Circuit, have long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citing 100 years of precedent); *see also In re Interpublic Sec. Litig.*, Civ. 6527 (DLC), 2004 U.S. Dist. LEXIS 21429, at *30-31 (S.D.N.Y. Oct. 27, 2004) ("It is well established that where an attorney creates a common fund from which members of a class are compensated for a common injury, the attorneys who created the fund are entitled to 'a reasonable fee – set by the court – to be taken from the fund'") (citation omitted). The rationale for the common fund doctrine is an equitable one: it prevents unjust enrichment of those benefiting from a lawsuit without contributing to its cost. *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (citing *Boeing*, 444 U.S. at 478); *In re Veeco Instruments Secs. Litig.*, No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 85554, at *7 (S.D.N.Y. Nov. 7, 2007) ("Fees and expenses are paid from the common fund so that class members contribute equally towards the costs associated with litigation pursued on their behalf."); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (citing *Internal Imp. Fund Trustees v. Greenough*, 105 U.S. 527, 536 (1881)) (a traditional purpose of the common fund doctrine is to make "fair and just allowances" to plaintiffs' counsel).

Moreover, public policy also supports payment of fees from the common fund. "Private actions to redress real injuries ... could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *27 (S.D.N.Y. Oct. 24, 2005).

## B. The Standard for Approval of Attorneys' Fees in Common Fund Cases

Courts have traditionally employed two methods for calculating reasonable attorneys' fees in securities class actions, the percentage-of-the-fund method and the lodestar method. *Maley*, 186 F. Supp. 2d at 369. Although the Second Circuit has held that district courts may use either method when determining an award of attorneys' fees, "The trend in this Circuit is toward the percentage method ... which 'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of the litigation.'" *Wal-Mart Stores, Inc. v. U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *see Veeco*, 2007 U.S. Dist. LEXIS 85554, at *39 (awarding 30% of $5.5 million settlement fund and employing percentage method with lodestar 'cross-check').[8] The percentage-of-the-fund method is also embodied in the Private Securities Litigation Reform Act ("PSLRA"), which states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount" recovered for the class. 15 U.S.C. §78u-4(a)(6) (emphasis added). *See also* the cases cited below in §III(C)(1). In any case, an award of attorneys' fees must be reasonable under the circumstances

---

[8] While the Court of Appeals for the Second Circuit encourages use of the lodestar method as a "cross check," it has acknowledged that the lodestar method on its own "proved vexing" and resulted in "an inevitable waste of judicial resources." *Goldberger*, 209 F.3d at 48-49; *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999) ("percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases"); *see also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004) (noting that lodestar determination was often a "cumbersome, enervating, and often surrealistic process").

of the particular case. *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989) (recognizing that an appropriate fee is intended to approximate what counsel would receive if they were bargaining for the services in the marketplace).

Regardless of whether the percentage-of-the-fund method or lodestar method is applied, courts in the Second Circuit also consider traditional criteria that reflect a reasonable fee in common fund cases, including: (i) the time and labor expended by counsel; (ii) the risks of the litigation; (iii) the magnitude and complexity of the litigation; (iv) the requested fee in relation to the settlement; (v) the quality of representation; and (vi) public policy considerations. *Goldberger*, 209 F.3d at 50.

### 1. The Requested Fee in Relation to the Settlement

Courts in the Second Circuit consistently award percentage fees to plaintiff's counsel that is equal to or greater than the fee requested by Lead Counsel herein. *See, e.g., Reynolds v. Repsol YPF, S.A.*, Civil Action No. 1:06-cv-00733-DAB, slip op. at 1 (S.D.N.Y May 7, 2008) (Batts, J.) (awarding 25% of $8 million settlement fund and noting that "courts throughout the [Second] Circuit regularly award fees of 25% to 30% or more of the total recovery under the percentage-of –the-fund method."); *Veeco*, 2007 U.S. Dist. LEXIS 85629, at *39 (awarding 30% of $5.5 million settlement fund); *In re TV Azteca S.A. DE C.V., Secs. Litig.*, Civil Action No. 1:04-CV-546 (JES), slip op. at 8 (S.D.N.Y. July 19, 2007) (Sprizzo, J.) (awarding 25% of $1.2 million settlement fund); *Montoya, et al. v. Mamma.com, Inc. et al.*, Consolidated Civil Action Case No. 1:05-cv-02313 (HB), slip op. at 8 (S.D.N.Y. July 13, 2007) (Baer, Jr., J.) (awarding 25% of $3.15 million settlement fund); *In re Van der Moolen Holding N.V. Sec. Litig.*, No. 1:03-CV-8284 (RWS), slip op. at 2 (S.D.N.Y. Dec. 6, 2006) (awarding 33 1/3% of $8 million fund); *Boris Pozniak vs. Imperial Chemical Industries, PLC*, Civil Action No. 1:03-cv-2457, slip op. at 7 (S.D.N.Y. Sept. 18, 2006) (Buchenwald, J.)

(awarding 33 1/3% of $3.8 million fund); *Liberty Capital Group, Inc. v. Kongzhong Corp., et al.*, Civil Action No. 1:04-CV-06746-SAS, slip op. at 1 (S.D.N.Y. Apr. 24, 2006) (Scheindlin, J.) (awarding 30% of $3.5 million settlement fund); *In re Reliance Group Holdings, Inc. Sec. Litig.*, No. 00 Civ. 04653 (TPG), slip op. at 11 (S.D.N.Y. Mar. 27, 2006) (Griesa, J.) (awarding 28% of $15 million fund); *Hicks*, 2005 U.S. Dist. LEXIS 24890, at *24-25 (finding that 30% of $10 million fund is both "consistent" with comparable settlements in the Second Circuit and "does not produce...a windfall"); *Silverberg v. People's Bank*, 23 Fed. Appx. 46, 48 (2d Cir. 2001) (affirming award of nearly 33-1/3% of $7.7 million fund). Indeed, the requested fee is equal to or below awards commonly made by courts in this Circuit.[9]

However, those cases are not this case. In this case, plaintiff put defendant to tremendous expense, abandoned most of the significant allegations of wrongdoing as soon as they were challenged, then settled the case rather than take the quite modest amount of court-ordered discovery that would either have proven or disproven the core remaining allegation in the lawsuit. I am thus unwilling to award counsel 25% of the settlement.

## 2. *Time and Labor Expended by Counsel*

### a. *The Labor Dedicated by Lead Counsel Does Not Justify the Requested Fee*

The work undertaken by Lead Counsel does not support court approval of the requested fee

---

[9] Courts in other jurisdictions also routinely award attorneys' fees of 25% of the common fund, or more, to plaintiffs' counsel working on a contingent basis. *See In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (noting that for settlements with total recovery in the range of $1 to $50 million, median fee award is one-third); THE MANUAL FOR COMPLEX LITIGATION §14.121 (4th ed. 2004) (stating that a fee of 25% of a common fund "represents a typical benchmark"); 4 Robert Newberg, NEWBERG ON CLASS ACTIONS § 14:6 at 551 (4th ed. 2002) ("Empirical studies show that, regardless of whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.").

award at the level of 25%.

Lead Counsel drafted two detailed amended complaints setting forth the fruits of Lead Counsel's "extensive investigation." Defendants spent significant resources moving to dismiss the First Amended Complaint – the one with all the nasty allegations about conflicts of interest and illegal dividends and self-dealing by Pistolis. Rather than respond to that motion, Lead Counsel threw in the towel and filed a  second amended complaint that dropped nearly every serious (and scurrilous) allegation against defendants. In a statement that the court found particularly galling, Lead Counsel described its changes to the First Amended Pleading as "correcting....minor factual errors." The "amended and corrected" pleading came very close to being dismissed outright by this court in response to defendants' second motion to dismiss – a motion that cost defendants another pretty penny and that should have been wholly unnecessary.

After the court  issued its decision and idenitified the quite narrow issue that would resolve the matter one way or another, Lead Counsel  reviewed and analyzed approximately 400(!) pages of documents. It promptly abandoned any plan to take the four authorized depositions in order to get to the bottom of its allegations. Instead, Lead Counsel quickly settled the case for whatever it could get. As I said previously, the pittance amount recovered makes a great deal of sense from defendants' perspective – it is nuisance value, and no court would force a defendant to continue litigating to victory when any such victory would be pyrrhic.  But it is obvious that Lead Counsel accomplished very little for this class. The class' lack of interest in the settlement no doubt reflects, as much as anything else, the rather modest nature of the claim actually alleged in the operative pleading.

Lead Counsel then spent what is no doubt an inordinate amount of time preparing these moving papers, with their inflated description of the work actually performed in this case. It was, in

-26-

fact, very little.

Lead Counsel will continue to perform legal work on behalf of the Class because the Court is approving the proposed Settlement, and it should be compensated for that work.

On the whole, the court is convinced that 10% of the settlement is sufficient for a fee award.

## b. *The Lodestar Amount is Unreliable*

Courts in the Second Circuit often cross-check the "percentage fee with counsel's lodestar" to support the reasonableness of a fee awarded under the percentage-of-the-fund method. *Goldberger*, 209 F.3d at 50. In conducting such a cross-check, the court must engage in a two-step analysis: first, to determine the lodestar, the court multiplies the number of hours each attorney spent on the case by each attorney's reasonable hourly rate;[10] and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained and the quality of the attorney's work. *See, e.g., Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167-69 (3d Cir. 1973), *subsequently refined in, Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116-18 (3d Cir. 1976) (*en banc*)

As set forth in their lodestar and expense submissions, Lead Counsel and Liaison Counsel devoted over 2,704 hours to this Action. As a result, the lodestar is $1,077,409, which is very nearly the amount of the settlement. This suggests that far, far too many hours were expended on this matter.

---

[10] Lead Counsel has calculated their lodestars using their current hourly rates. The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Jenkins*, 491 U.S. at 283-84; *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983) (stating that the use of current rates is appropriate where services were provided within two or three years of application).

Document discovery consisted of reviewing 400 documents. Depositions were never held. Spewing briefs in support of a settlement out of the computer where they are stored in order to be used over and over again is a task that could be performed by a paraprofessional at virtually no cost. Counsel's hours spent drafting the complaint that "disappeared" as soon as it was attacked are not, in the opinion of this court, compensable. Time was not expended efficiently, given the nature of the work product.

Accordingly, the court finds the lodestar amount to be unreliable as a comparator and declines to consider it.

### 3.    The Risks of Litigation

#### a.    The Contingent Nature of Lead Counsel's Representation Does Not Justify the Requested Fee

The Second Circuit has recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) (citation omitted). "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, No. 01-CV-11814(MP), 2004 U.S. Dist. LEXIS 8608, at *11 (S.D.N.Y. May 14, 2004); *see also In re American Bank Note Holographics*, 127 F. Supp. 2d 418, 432-33 (S.D.N.Y. 2001) (concluding that it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award"). The risk of litigation is often

cited as the "most important *Goldberger* factor." *In re Ashanti Goldfields Sec. Litig.*, Civil Action No. CV-00-717 (DGT), 2005 U.S. Dist. LEXIS 28431, at *9 (E.D.N.Y. Nov. 15, 2005) (internal citation omitted).

Here, Lead Counsel undertook all of the risks of this Action on a contingent fee basis -- the risks of surviving dispositive motions, obtaining class certification, proving liability, loss causation and damages, prevailing in the "battle of the experts," litigating the Action through trial and possible appeals -- with the possibility that it could litigate the case for years and never get paid. The court is not impressed, however, given the paucity of allegations in the ultimate pleading and the unnecessary expense to which the defendants were put. And ultimately, what is noticeable about this case is that Lead Counsel refused to take the ultimate risk that the case would prove worthless by completing the quite modest amount of discovery that remained to be done. Frankly, this smacks of conscious avoidance of knowledge by Lead Counsel.

The court absolutely disagrees with the proposition that the burden on contingent fee counsel is greater than it is on counsel who are paid "as they go," because it is a false comparison. The proper comparison is the burden on the LITIGANT who must pay retained counsel on as "as they go" basis versus the contingent fee attorney who forces the litigant into that posture. The less meritorious the action, the greater the burden on the LITIGANT who – unlike contingent fee counsel – has no ability to decline the case, but must defend itself against whatever litigation is foisted upon it.

I cannot know for sure, but I suspect that there was a significant possibility that this case would not have resulted in any recovery for the class – or that any class would turn out to be so small as to make the game not worth the candle. I cannot in good faith reward class counsel with 25% of the modest settlement is was able to procure in these circumstances.

-29-

### 4. *The Magnitude and Complexity of the Litigation*

The complexity of the litigation is a significant factor examined by courts evaluating the reasonableness of attorneys' fees requested by class counsel. *See Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 216 (S.D.N.Y. 1992). This, as it turned out, was not a particular complex case. The allegations that would have resulted in extensvie discovery were voluntarily withdrawn. The one remaining allegation was so narrow and focused that the court directed that discovery be completed within thirty days and be limited to four depositions!

### 5. *The Quality of Representation*

Another factor to be considered with respect to the reasonableness of the requested fee is the quality of the representation by Lead Counsel, the standing of that counsel at the bar, and the quality of opposing counsel. *See Global Crossing*, 225 F.R.D. at 467. Lead Counsel has many years of experience in complex federal civil litigation, particularly the litigation of securities and other class actions, has successfully litigated these types of actions in courts throughout the United States. It has sufficient expertise to "know when to hold 'em and know when to fold 'em."[11] An award of 10% of the total recovery will be enough to compensate for that knowledge.

### 6. *Public Policy Considerations*

"A strong public policy concern exists for rewarding firms for bringing *successful* securities litigation." *In re Ashanti Goldfields*, 2005 U.S. Dist. LEXIS 28431, at *14. *Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988) (the federal securities laws are remedial in nature, and the courts must encourage private lawsuits to effectuate their purpose of protecting investors)(emphasis added). The

---

[11] Kenny Rogers, "The Gambler."

United States Supreme Court, in fact, has recently reiterated that "meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions. . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007).

However, an equally strong public policy consideration exists for discouraging the commencement of meritless lawsuits that force companies and their directors to expend vast amounts of resources that would otherwise be spent on economically productive activity. As should be clear, the two most significant actions taken by lead counsel in this case were filing a complaint whose key allegations were withdrawn as soon as defendants moved to dismiss, and settling rather than taking the depositions that would either have proved or disproved their lone remaining claim. While *meritorious* prive actions to enforce federal securities laws are important, this case hasn't been handled like a meritorious lawsuit – it has been handled like a strike suit. The fact that the SEC undertook an informal investigation of TOPT and then dropped the matter does not add luster to lead counsel's performance before this court. Rewarding Lead Counsel with 25% of the recovery negotiated for the class in a suit of such questionable provenance would be unseemly. Courts ought not be in the business of encouraging the maintenance of actions that counsel are so obviously unwilling to pursue on the merits.

## C. *The Class' Reaction to the Fee Request*

In addition to the criteria set forth in *Goldberger*, courts in the Second Circuit also consider the reaction of the Class to the fee request in deciding whether to award the requested fee. *See Maley*, 186 F. Supp. 2d at 374 (noting that Class' reaction to the fee and expenses application is entitled to great weight by the Court). The Notice advised Class Members that Lead Counsel would

be requesting an award of attorneys' fees of up to 30% of the Settlement Amount and reimbursement of its expenses in an amount not to exceed $35,000, plus interest on both amounts. As of the July 2, 2008 deadline for filing objections, not one potential Class Member has objected to these requests. *See* Decl. ¶30. *See also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (finding that "low level of objections is a rare phenomenon"). The complete absence of objections to Lead Counsel's request for attorneys' fees strongly suggests that no one except Lead Counsel has the slightest interest in this action.

## V.  *Expenses*

It is well established in this Circuit that "Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation' of those clients." *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003). Here, Lead Counsel also requests reimbursement of out-of-pocket expenses in the amount of $26,777.33, incurred to date in connection with the prosecution of the Action on behalf of the Class, plus interest on such amount at the same rate as earned by the Class. A large portion of these expenses was used to fund Lead Plaintiff's investigation, and these expenses were critical to Lead Counsel's success in achieving the proposed Settlement. The remaining expenses arise from photocopying of documents, on-line research, messenger services, postage, express mail and next day delivery, long distance telephone and facsimile expenses, transportation, meals, travel and other incidental expenses directly related to the prosecution of this Action. *See Global Crossing*, 225 F.R.D. at 468 ("The expenses incurred - which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review - are the type for which 'the paying, arms' length market'

-32-

reimburses attorneys..[and] [f]or this reason, they are properly chargeable to the Settlement fund.").

Moreover, the affidavits submitted herewith demonstrate that the requested expenses were reasonable and appropriately incurred and warrant reimbursement. *See* Exhibits 2 and 3 to the Declaration. No objections were received regarding this expense figure. Decl. ¶56. Lead counsel is awarded expenses, without interest.

## VI.    *Reimbursement Awards to the Lead Plaintiff*

The PSLRA specifically provides for reimbursement to representative plaintiffs in securities

fraud class actions:

> The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. **Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.**

15 U.S.C. § 78u-4(a)(4)" 15 U.S.C. § 78u-4(a)(4) (emphasis added). Lead Counsel asks that $3,000

be paid to Lead Plaintiff. The request is granted.

This constitutes the decision and order of the Court. The Clerk of the Court is directed to

close the file.

Dated: July 31, 2008

_____

U.S.D.J.

BY ECF TO ALL COUNSEL

-33-